UNITED STATES DISTRICT COURT

for the

NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION


| UNITED STATES | | |
| --- | --- | --- |
| V. | | 3:08CR22-LAC |
| JAMES FREEMAN | | |


DEFENDANT'S MEMORANDUM IN SUPPORT OF A §2255 MOTION

TO VACATE, SET ASIDE OR CORRECT A SENTENCE

TABLE OF CONTENTS

Table of Authorities ........................... i

Introduction ................................... 1

Errors in the Superseding Indictment ........... 4

Evidence Sufficiency ........................... 12

Improper Testimony ............................. 43

Misjoinder and Prejudice ....................... 47

Access to Evidence ............................. 52

Ineffective Assistance of Counsel ............. 56

Request for an Evidentiary Hearing ............. 63

Conclusion ..................................... 64

TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT

Arizona v. Youngblood, 488 U.S. 51 (1988) ... 55

Banks v. Dretke, 540 U.S. 668 (2004) ... 56

Brady v. Maryland, 378 U.S. 83 (1963) ... 54-55

Geders v. United States, 425 U.S. 80 (1976) ... 60

Jones v. Barnes, 463 U.S. 745 (1983) ... 60,61

Russell v. United States, 369 U.S. 749 (1962) ... 7

Strickland v. Washington, 466 U.S. 668 (1984) ... 56

United States v. Cabrales, 529 U.S. 1 (1998) ... 48

United States v. Cronic, 466 U.S. 648 (1984) ... 58-59

UNITED STATES CIRCUIT COURTS

Darden v. United States, U.S. App. LEXIS 2928
(11th Cir.2013) ... 59

Eagle v. Linahan, 279 F.3d 926 (11th Cir.2001) ... 61

Grossman v. McDonough, 466 F.3d 1325 (11th Cir.2006) ... 55

Head v. United States, 489 A.2d 798 (D.C. 1986) ... 61

Hill v. Moore, 175 F.3d 915 (11th Cir.1999) ... 63

Tilton v. Playboy Entm't Group, Inc, 554 F.3d 1371
(11th Cir.2009) ... 32-33

United States v. Alvarez-Moreno, 874 F.2d 1402
(11th Cir.1989) ... 7,9

United States v. Amirault, 123 F.3d 28
(1st Cir.1999) ... 23-26

United States v. Arvin, 900 F.2d 1385 (9th Cir.1988) ... 27

United States v. Baker, 98 F.3d 330 (8th Cir.1996) ... 49

United States v. Blankenship, 382 F.3d 1110
(11th Cir.2004) ... 49

United States v. Bobo, 344 F.3d 1076 (11th Cir.2003) ... 5

United States v. Brown, 579 F.3d 672 (6th Cir.2009) ... 21

United States v. Burton, 871 F.2d 1566 (11th Cir.1989) ... 10

United States v. Cabrales, 109 F.3d 471 (8th Cir.1997) ... 48

United States v. Calderon, 127 F.3d 1314
(11th Cir.1997) ... 40

United States v. Chastain, 198 F.3d 1338
(11th Cir.1999) ... 45

United States v. Chavez, 584 F.3d 1354 (11th Cir.2009) ... 48

United States v. Colon, 549 F.3d 567 (7th Cir.2008) ... 37

United States v. Coporale, 806 F.2d 1487 (11th Cir.1986)

United States v. Daniels, 653 F.3d 399 (6th Cir.2011) ... 10

United States v. Frank, 494 F.2d 145 (2d Cir.1973) ... 59

United States v. Friske, 640 F.3d 1288 (11th Cir.2011) ... 43

United States v. Gari, 572 F.3d 1352 (11th Cir.2009) ... 49

United States v. Greer, 440 F.3d 1267
(11th Cir.2006) ... 60-61

United States v. Haupt, 136 F.2d 661 (7th Cir.1943) ... 1

United States v. Howard, 953 F.2d 610 (11th Cir.1992) ... 53

United States v. Kincannon, 567 F.3d 893
(7th Cir.1998) ... 37-38

United States v. Lane, 584 F.2d 60 (5th Cir.1978) ... 49

United States v. Lovern, 590 F.3d 1095 (10th Cir.2009) ... 43

United States v. Lyons, 53 F.3d 1198 (11th Cir.1995) ... 40

United States v. Maseratti, 1 F.3d 330 (5th Cir.1993) ... 37

United States v. McGarity, 669 F.3d 1218

(11th Cir.2012) ... 5-6,7,15-16,18

United States v. Mora, 377 Fed. Appx. 842

(11th Cir.2010) ... 37

United States v. Ndiaye, 434 F.3d 1270 (11th Cir.2006) ... 36

United States v. Nelson-Rodriguez, 319 F.3d 12

(1st Cir.2003) ... 10-11

United States v. Noel, 581 F.3d 490 (7th Cir.2009) ... 44

United States v. Prince, 883 F.2d 953 (11th Cir.1989) ... 18

United States v. Prosperi, 201 F.3d 1335

(11th Cir.2000) ... 50

United States v. Rivera, 546 F.3d 245 (2d Cir.2008) ... 22

United States v. Rivera, 775 F.2d 1559 (11th Cir.1985) ... 44

United States v. Schlei, 122 F.3d 944 (11th Cir.1997) ... 50

United States v. Schmitz, 634 F.3d 1247

(11th Cir.2011) ... 4-5

United States v. Solomon, 686 F.2d 863 (11th Cir.1982) ... 37

United States v. Stanback, U.S. App. LEXIS 24234

(11th Cir.2011) ... 44

United States v. Steen, 634 F.3d 822

(5th Cir.2011) ... 23,25,27

United States v. U.S. District Court, 858 F.2d 534

(9th Cir.1988) ... 2

United States v. Valencia-Trujillo, 573 F.3d 1171

(11th Cir.2009) ... 7,9

United States v. Villard, 885 F.2d 117

(3rd Cir.1989) ... 21,24,26

United States v. Villegas, 911 F.2d 623 (11th Cir.1990) ... 2

United States v. Wallenfang, 568 F.3d 649

(8th Cir.2009) ... 22

United States v. Williams, 444 F.3d 1286

(11th Cir.2006) ... 20

United States v. Woodruff, 296 F.3d 1041

(11th Cir.2002) ... 5

UNITED STATES DISTRICT COURTS

Tilton v. Deslin Hotels, Inc, U.S. Dist. LEXIS 64168

(M.D. Fla 2007) ... 32

United States v. Hammond, 2009 U.S. Dist. LEXIS 126802

(N.D. Fla 2009) ... 63

United States v. Johnson, U.S. Dist. LEXIS 63515

(M.D. Fla 2011) ... 23

United States v. Peterson, 544 F.Supp. 2d. 1363

(M.D. Ga 2008) ... 16

FEDERAL RULES

Federal Rules of Evidence 1002 ... 53

Federal Rules of Criminal Procedure 7(c) ... 10

Federal Rules of Criminal Procedure 8(b) ... 47

Federal Rules of Criminal Procedure 12 ... 56-57

OTHER

Criminal Defense Techniques - Cipes, Bernstein & Hull

(Matthew Bender Revised Edition) ... 57,58

## INTRODUCTION

As evidenced by the sheer number of issues raised, this case was overrun with errors. Many of those errors can be attributed to two facts. One, it was a child pornography case. And two, it involved Usenet.

It is not disputed that images and videos of young children being sexually abused are reprehensible, and that society strongly condemns their production and distribution. But that very nature requires the utmost caution in a criminal proceeding involving such images and videos, since it is very easy for a person's individual emotions to creep to the forefront of what should be an otherwise logical interpretation of the facts and law based on sound reasoning. The United States Constitution guarantees certain rights to defendants, and it is even more important to assure these rights are protected in cases like this. Circuit Judge Major, writing for the court, said "Of the many rights guaranteed the people of this Republic, there is none more sacred than that of trial by jury. Such right comprehends a fair determination, free from passion or prejudice, of the issues involved. The right is all-inclusive; it embraces every class and type of person. Those for whom we have contempt or even hatred are equally entitled to its benefit." United States v. Haupt, 136 F.2d 661, 671 (7th Cir.1943)(discussing the right to a fair trial by a defendant accused of espionage, the World War II era equivalent of a child pornography offense). More recently, to paraphrase the Eleventh Circuit, "Deciding what is or is

1

not sufficient evidence is always a difficult chore and it becomes even more so when the factual backdrop consists of a reprehensible traffic in [child pornography]. But the presumption of innocence remains constant, irrespective of the heinous nature of condemned activity, as does the requirement that the government prove its case beyond a reasonable doubt, notwithstanding the presence of mere suspicion and speculation." United States v. Villegas, 911 F.2d 623, 630 (11th Cir.1990). The Ninth Circuit sums the matter up well: "... even as compelling a societal interest as the protection of minors must occasionally yield to specific constitutional guarantees." United States v. U.S. District Court - Central District of California, 858 F.2d 534, 543 (9th Cir.1988). This motion now before the court addresses myriad errors of a constitutional magnitude, and it is hoped that those errors will be addressed in a clear manner without emotion or bias due to the nature of the offenses originally charged.

This case also involved Usenet, a portion of the Internet the general public is not typically familiar with. As such, attorneys, jurors and the court were faced with the difficult task of trying a case they did not fully understand. While the government's witness (Constable Brendan Power) did provide somewhat of an explanation regarding the operation of Usenet (Doc 720 ppg 57-68), some important aspects were not well-explained or addressed at all and need to be clarified here for the court to better understand the arguments presented. Every Usenet server is controlled by a "system

2

administrator", a position not unlike the website administrators the general public is more familiar with. System administrators control what groups are on the servers they run, how long messages are retained, how and when messages posted to the server propagate (are distributed) to other servers and how and when the server they operate retrieves messages propagating from other servers. In the case of commercial servers, typically the server owner dictates to the system administrator the parameters under which the server will operate. What is important here is that NEVER are these operations controlled by the Usenet user (such as the defendants in this case). The presence of the administrator is important for two reasons. The first is group creation. Constable Power testified that groups are "user created" (Doc 720 pg 61). This is not entirely accurate. Usenet users desiring to have a new group created must first submit the group name along with an explanation of the purpose of the group in an existing newsgroup called "alt.config". This group is used by system administrators throughout Usenet as a common meeting place to discuss problems and keep Usenet running smoothly. Because it is the system administrators who decide what groups will be carried on their servers, no new groups can be created without their blessing. It was never alleged by the government that any alleged conspirator was a system administrator for any Usenet server. The second has to do with propagation (distribution). When a user posts a message, text or otherwise, that message goes to the server he was logged

3

into at the time and stays there. It can be read almost immediately by other users of that particular server. But users of other servers will not be able to read it until such time that the message is allowed to propagate AND the other server has chosen to receive messages from the propagating server. Typically this action occurs rapidly, although in some cases it can be a matter of days. But the distinction to be made is that it is at the behest of the system administrator that the message goes on, not the user. This leads to the final omission of the government, one that may have changed the jury's thinking. In Usenet there is NEVER a direct connection between two or more users, unlike peer-to-peer or chat rooms. No file uploaded from one computer ever goes directly to the computer of another user, even if they are both logged into the same server. Thus when the government makes claims or infers that messages and files were sent from one alleged conspirator to another, the claim is clearly erroneous.

This memorandum does not follow the order of the grounds as listed. Instead, it broadly addresses issues based on their relative importance and likelihood of having a favorable impact on Freeman.

ERRORS IN THE SUPERSEDING INDICTMENT

Ground Eight addresses the indictment's failure to state the offense conduct with particularity. An indictment is sufficient if it "tracks the language of the statute" and "provides a statement of facts informing the accused of the

4

specific offense with which [he] is charged." United States v.
Schmitz, 634 F.3d 1247, 1261 (11th Cir.2011). When an
indictment tracks the language of the statute "it must be
accompanied with such a statement of the facts and
circumstances as will inform the accused of the specific
offense, coming under the general description, with which he
is charged." United States v. Bobo, 344 F.3d 1076, 1083 (11th
Cir.2003). "When the indictment uses generic terms, it must
state the offense with particularity." Id. An indictment is
considered to ensure the provisions of constitutional notice
and due process if it "1) presents the essential elements of
the charged offense, 2) notifies the accused of the charges to
be defended against, and 3) enables the accused to rely upon a
judgement under the indictment as a bar against double
jeopardy for any subsequent prosecution for the same
[charge]." United States v. Woodruff, 296 F.3d 1041, 1046
(11th Cir.2002). As the argument applies to Counts 6, 18 and
29, this court need look no further than the Eleventh
Circuit's decision in United States v. McGarity, et al, 669
F.3d 1218 (11th Cir.2012), where it vacated obstruction of
justice convictions arising out of the same superseding
indictment complained of here. The defendants, including
Freeman, contended that the superseding indictment "must
identify which official proceeding was obstructed and
otherwise provide sufficient notice to the defendant of the
factual predicate for the charge." 669 F.3d, at 1238. The
court stated that "the only notice provided here is that the

defendants obstructed an unknown official proceeding, at some
time in some place by some action". 669 F.3d, at 1240. Finding
that "these deficiencies cannot be considered minor", the
court vacated the obstruction convictions of all defendants.
Id. The charging language of Counts 6, 18 and 29 is
structurally similar to that of the obstruction count. An 18-
month date range is provided, and a general location ("in the
Northern District of Florida and elsewhere"). The counts go on
to merely parrot the statute language. It is not disputed that
that the counts meet the first prong of Woodruff, but just as
the obstruction count was deficient, Counts 6, 18 and 29
likewise fail to satisfy the second or third prongs. The
counts provide no notice of what images were advertised,
transported, shipped or received; when the actions are said to
have taken place with any degree of certainty, or where they
occurred. There are two factors that make these deficiencies
more serious than in the average criminal case. The first is
the affirmative defense allowed under U.S.C. §2252A(c), which
provides in part that "in no event later than 10 days before
commencement of the trial" the defendant must provide notice
to the court and the government of his intention to assert the
defense and provide the evidentiary basis of his claim. This
affirmative defense allows the defendant to claim that the
person in the images is not a minor or a real person, a
defense that can't be made if the defendant does not know what
image(s) are the subject of the prosecution. The government's
position no doubt is that "the defendant knows what he did,

so why should I have to tell him?", an argument it had some
success with pretrial in avoiding disclosure requirements.
Such an argument is frivolous, and fails to comport with the
law of the Eleventh Circuit and over a century of Supreme
Court precedent. The second factor, equally important in this
case, is that it was a multi-count multi-defendant indictment,
alleging offenses by 14 persons in 9 different states. Without
the required particularity it is not possible to present
pretrial motions regarding severance of charges or defendants,
or raise venue issues. The language of Count 1 is equally
deficient, even though the Eleventh Circuit went to great
lengths in an attempt to state otherwise. The panel
acknowledged the defendants' claim that "it is hopelessly
vague and provides no detail regarding the three predicate
offenses". McGarity, 669 F.3d, at 1237. But it then went on to
describe the claim as a "contention that each predicate
offense... must be pled with specificity." Id. In rejecting
the defendants' claim, the court relied on its prior rulings
in United States v. Alvarez-Moreno, 874 F.2d 1402 (11th
Cir.1989) and United States v. Valencia-Trujillo, 573 F.3d
1171 (11th Cir.2009)(both cases involved the similar
"continuing criminal enterprise" statute), citing the premise
that predicate acts "need not be charged or even set forth as
predicate acts in the indictment." Alvarez-Moreno, 874 F.2d,
at 1408. The court did not explain why the indictments were
not required to conform with the Supreme Court's decision in
Russell v. United States, 369 U.S. 749, 765 (1962) or their

7

own decisions in Bobo and Schmitz (both grounded in the Russell decision), each requiring a statement of offense conduct with particularity. A brief review of Alvarez-Moreno and Valencia-Trujillo indicates they are factually distinguishable. In Alvarez-Moreno the court stated "The overt acts in the original unredacted indictments specifically referred to the "David Jaffee money delivery", the "Oscar Gerera transaction" and the "Denver incident involving Said Jatter." 874 F.2d, at 1411. In Valencia-Trujillo, which approved Alvarez-Moreno, the court advised that "Count III alleged that Valencia-Trujillo conducted a [CCE]... The count listed chronologically thirty-six predicate acts related to eighteen alleged smuggling event". 573 F.3d, at 1174. In both cases cited the indictments did in fact state with particularity the offense conduct said to underlay the predicate acts. A secondary issue is that the Eleventh Circuit in both cases relied in large part on the nature of a CCE offense, being the existence of a far-flung large-scale drug distribution enterprise under the control of the charged defendant. But that is not the nature of the CEE offense. The CEE requires no large-scale sweeping enterprise. It is an individual offense, the essence of which is a defendant's repetitive offense conduct with a diversity of victims and collaborating individuals. While it is acceptable to rely in part on existing CCE precedent as a guide in CEE cases, the differences in the two statutes and their purposes must be noted and considered. Finally, the Eleventh Circuit's

reliance on United States v. Daniels, 653 F.3d 399, 413 (6th Cir.2011) is bootstrapping. The Sixth Circuit actually relies in part on the Eleventh Circuit's Wayerski decision as authority to use CCE caselaw in a CEE case. Having failed to directly address whether or not Russell's particularity requirement applies here and is or is not met, the panel's decision is of no help. On its face the superseding indictment is insufficient for failing to state an offense as applies to Counts 1, 6, 18 and 29, and the convictions must be vacated for the same reason the obstruction convictions were vacated.

Ground Thirty-Five alleges that Count 2 constitutes a duplicitous count. A count in an indictment is duplicitous if it charges two or more "separate and distinct" offenses. United States v. Burton, 871 F.2d 1566, 1573 (11th Cir.1989). On its face the indictment would appear to be sound. The plain language alleges a general conspiracy charged under 18 U.S.C. §371, going on to list the 5 possible 'means' involved in the conspiracy and an overt act allegedly committed by each defendant in furtherance of the conspiracy. This charging method is acceptable. Federal Rule of Criminal Procedure 7(c) specifically provides that "[it] may be alleged in a single count [of an indictment or information] that the means by which the defendant committed the offense are unknown or that he committed it by one or more specific means." See also United States v. Nelson-Rodriguez, 319 F.3d 12 (1st Cir.2003)(allegation in a single count of conspiracy to commit several offenses is not duplicitous because the conspiracy

10

constitutes the crime charged). It is possible to overcome the prejudice inherent in a duplicitous count by obtaining a bill of particulars or seeking a jury instruction specifically designed to resolve the problem. Freeman sought a bill of particulars (Doc 321), which the government for obvious reasons declined to provide and the court refused to order. At the charging conference, Freeman agreed to jury instructions that would prevent any problems (Doc 469 ppg 18-21). The instruction begins with a description of what §371 criminalizes, and goes on to discuss 'the conspiracy' in several aspects. The instruction closes with "In this instance, with regard to the alleged conspiracy, the indictment charges that the Defendant conspired to...", describes the 5 possible means, and instructs the jury that if it finds the defendant did not conspire to violate all 5 it must unanimously agree on what means did apply. The verdict form used also clearly instructed the jury to first determine if the defendant violated §371, and if so, in what way (that is, by what applicable means). So as written and charged, and understood by the defendants, the count would appear not to be duplicitous. However, the Eleventh Circuit's actions in deciding McGarity lead to a different conclusion. In upholding Freeman's conviction on Count 1, the CEE offense, the court agreed with the government that Freeman had been convicted of substantive offenses of conspiracy to advertise and conspiracy to transport or ship child pornography under Count 2. In affirming the use of a 2-point sentencing enhancement for

11

obstruction of justice by citing the Wayerski decision, the McGarity panel put forth the premise that Count 2 also involved a substantive offense of conspiracy to obstruct justice. Either Count 2 is duplicitous in charging 6 different conspiracies under a single count or, as pointed out elsewhere in this memorandum, there are errors in the Eleventh Circuit's ruling and the sentences imposed by the district court.

## EVIDENCE SUFFICIENCY

The government and the Eleventh Circuit have both characterized the evidence in this case as "overwhelming". This evidence can be said to consist of 3 parts. Text and content downloaded from Usenet by Constable Brendan Power, subpoenas issued by the FBI, and Freeman's so-called "confession" to law enforcement. It is agreed that there is an overwhelming AMOUNT of evidence in this case. But quantity is not quality, and much of the evidence lacks relevance. Was there overwhelming evidence OF GUILT? A review of the facts, as will be shown, requires an answer of "no". First, Constable Power downloaded several thousand text messages, most of which contained discussions having little or nothing to do with child pornography. Power retrieved 62 text postings said to have been originated by Freeman and containing information regarding images and videos that had been uploaded. Three of these postings became the basis of criminal charges (which, as shown later, did not constitute child pornography), indicating that the remaining posts must have been even more innocent. These postings by Freeman constitute only 10% of the original

12

postings Power downloaded and chose to save, and are conservatively estimated to include over 200,000 child modeling images (nearly half of the 403,000 images downloaded by Power). Second, the FBI issued over 400 subpoenas in this case. Relevant to Usenet postings, the government entered into evidence 3 subpoenas in which it sought information on various postings. While it is true that each of the subpoena returns entered into evidence show a particular posting came from Freeman's Usenet account, none of those postings had anything to do with child pornography or the specific postings the government was using as the basis of its prosecution. On cross-examination, Special Agent Charles Wilder testified quite clearly that the FBI had not subpoenaed a single one of the text postings or material uploads alleged to be by Freeman that were admitted into evidence. Wilder also categorically stated that it was not possible to know who posted a message or uploaded material without issuing a subpoena (Doc 721 ppg 295-306). Third, contrary to assertions by the government, Freeman never "confessed". As the record shows, Freeman's "confession" comes from the uncorroborated testimony of a rookie FBI agent, who had no familiarity with the case, stating what she allegedly overheard Freeman saying to other agents. As discussed in Ground 5, Freeman was coerced into speaking with the FBI and Constable Power. However, the FBI agent he spoke with did not testify at trial. When Constable Power did testify, he made no mention of ever speaking with Freeman or even that he had met him personally. On cross-

examination, Special Agent LeBlanc clarified that Freeman allegedly proffered the possibility that a photo series called "Daphne" that he had uploaded could have been child pornography. She also testified that Freeman was not shown anything specific to the charges before the jury or the evidence presented, including the text postings and images or videos. What the government repeatedly characterizes as a "full confession" is nothing more than a cobbling together of disjointed portions of oral statements Freeman made, all presented to the jury totally out of context. In summary, the government indeed had a large volume of data consisting of text postings and material uploads addressing innocent topics and/or legal images. It also had a large amount of subpoenas and returns, most of which was withheld from Freeman, none of which implicates Freeman in the conduct charged. And Freeman's "full confession" does not exist except in the wishful mind of the government. The apparent mountain of evidence gathered by the government actually works against a sense of sureness in their case due to the total lack of actual evidence proving guilt. It is only through inference-stacking and speculation that the government has sought to prove its case. Any reasonable person would have to question why over half the images in "the most sophisticated child pornography trading ring ever" are actually legal images; why in over 400 subpoenas the FBI neglected to include the actual messages and materials they intended to base their charges on, and why the FBI chose not to specifically ask Freeman about the conduct

he was charged with if he was in fact giving them a "full confession". It is not enough to gather a huge amount of paper, dump it in front of the jury, call it a "job well done", and ask for a conviction. Nor should this court let a conviction stand under such circumstances.

Prior to beginning any meaningful individual discussion on sufficiency of the evidence it is necessary to determine just what offense(s) Freeman was charged with committing. Normally this would not be difficult, as the indictment would have clearly provided the information. But, as previously discussed, that is not the case here. The Fifth Amendment right to an indictment by a Grand Jury by extension holds that Freeman's convictions can only be considered to have been based on the specific offense conduct the Grand Jury based its indictment on. In responding to a motion for a bill of particulars by defendant Wayerski, the government provided defense attorneys with a copy of "Government's Exhibit A" (Doc 198-1), a detailed listing of each count in the indictment and the offense conduct associated with each, which it had provided to the Grand Jury. No doubt the Government will claim these are "examples", leaving it free to roam around looking for some other factual basis for the convictions. Such a practice, however, is prohibited. Arguing on appeal, the government alleged that the CEE conviction could be based on any of 4 to 8 substantive advertisements, transportations and/or receptions of child pornography presented against each defendant. McGarity, 669 F.3d, at 1250. The Eleventh Circuit

rejected that premise, stating "Indeed, those other four to eight violations were neither charged in the Superseding Indictment nor addressed in the jury's verdict form... Therefore, regardless of how much evidence was offered at trial by the Government, it would be improper to infer unanimous agreement as to a specific offense by the members of the jury in the absence of a specific finding". Id. To paraphrase the findings of another district court in dismissing an indictment, "Thus, if the Government was allowed to go forward... it would be free to secure a conviction based on [the child pornography] that it thinks [the] defendant [advertised, transported or received] rather than on the [child pornography] upon which the Grand Jury based its indictment." United States v. Peterson, 544 F.Supp. 2d 1363, 1377 (Feb 28, 2008). Absent a unanimity instruction as to the substantive counts (which Freeman requested but the court, without objection, failed to give) it is not possible under these circumstances to determine just what the jury based its verdict on. Regardless, Freeman undertakes an analysis of the evidence presented as it applies to the offense conduct described in Doc 198-1 and which the Grand Jury based its indictment on. This will show that even had the indictment been clear and concise and the jury been properly instructed, the evidence still would not have been sufficient to reach reasonable doubt on the elements of each offense, let alone overcome it.

        According to Doc 198-1 (ppg 33-34), the Grand Jury

16

based its indictment of Freeman in Count 6 for advertising
child pornography on a February 19, 2007 text posting alleged
to have been posted by Freeman. The posting provides
information regarding what appears to be 7 different uploads
of material from child modeling websites. The posting closes
with with a postscript asking "Anybody want Show Stars Hana
eating a banana?". Show Stars is a Russian child modeling
website. The government went on to describe a video titled
"hanaorok.avi" and a picture set simply titled "K". It is not
explained where the government got the information for the
video or images, as it did not appear in the text posting. Nor
was that information provided to the trial or Grand juries.
Advertisement of child pornography under 18 U.S.C.
§2251(d)(1)(a) constitutes several elements that each need to
be proved beyond a reasonable doubt. The trial jury would need
to see the specific "notice" said to have been published by
Freeman in order to determine just what was offered, and then
would need to view the alleged offering to determine if it was
in fact child pornography. But a detailed discussion of these
elements need not be undertaken here. A review of the text
postings the government presented to the trial jury indicates
that none of them are the February 19 posting, and a review of
the 6 videos and handful of images briefly shown indicates
that none of them are the video or images described in Doc
198-1 as being the basis of the count. The government's proof
at trial regarding Count 6 must constitute a material
variance. The Eleventh Circuit has established a two step

inquiry when considering allegations of variance between indictments and proof at trial: (1) the court must first determine whether material variance did indeed occur, and, if so, (2) whether the defendant suffered substantial prejudice as a result of the variance. See United States v. Prince, 883 F.2d 953, 959 (11th Cir.1989). To establish prejudice, the defendant needs to show that "the proof at trial differ[s] so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense." United States v. Coporale, 806 F.2d 1487, 1500 (11th Cir.1986). Freeman was unable to properly prepare for a defense due to the lack of charging language in the indictment. The government's decision to not even submit the conduct the Grand Jury based its indictment on simply added insult to the injury. The only alternative to the existence of a material variance is a finding that Freeman was convicted of conduct for which the Grand Jury did not indict him, which the Eleventh Circuit has already stated would be impermissible. McGarity, 669 F.3d, at 1250. As pointed out, it is difficult if not impossible to state just what conduct the jury based its verdict on. But whatever it was, it was materially different than the facts, circumstances and content the Grand Jury used to return the indictment, and the conviction must be vacated. In closing, the government may seek to argue here that the jury could have based its conviction on aiding and abetting, which was charged and instructed. But such a claim would be totally devoid of evidentiary support, the

18

government having failed to present even the slightest spark
of speculation that Freeman may have actively involved himself
in the substantive advertisement offense conduct of another
defendant.

Returning to Doc 198-1 (ppg 45-46), the Grand Jury
based its Count 18 indictment for transportation of child
pornography on a video titled "h-o-ok.avi" allegedly
transported  by Freeman around February 7, 2007. The video is
described as being 21 minutes and 6 seconds in length, and
consisting of two prepubescent females who "... remove most of
their clothing, excluding their underwear (both girls are
wearing g-strings). The girls caress each other, and rub ice
on each other's bodies, to include their bare chests. The
girls then rub oil all over each other's bodies".
Transportation of child pornography has 4 essential elements:
(1) that the item was in fact transported in interstate or
foreign commerce, (2) that the defendant knew or believed the
item would be so transported, (3) that the item so transported
was in fact child pornography and, (4) that at the time of
said transportation the defendant believed the item so
transported was child pornography. In instructing the jury,
the court combined the first three elements into a single
element reading "That the Defendant knowingly transported or
shipped by computer in interstate or foreign commerce an item
or items of "child pornography", as charged.", and let the
fourth element remain free-standing. (Doc 469 pg 25). The
first question to answer is in two parts. Does the

"h-o-ok.avi" video meet the definition of child pornography
under 18 U.S.C. §2256 and the jury instructions at Doc 469 ppg
31-33, and could a reasonable juror have determined that the
video met the definition beyond a reasonable doubt? It is
readily apparent that the video contains no sexual
intercourse, bestiality, masturbation or sadistic or
masochistic abuse. Thus only lascivious exhibition of the
genitals or pubic area remains. The Eleventh Circuit has
stated "Virtually all lower courts that have addressed the
meaning of "lascivious exhibition" have embraced the widely
followed "Dost" test, originally developed by a California
District Court and affirmed in an opinion by the Ninth
Circuit." United States v. Williams, 444 F.3d 1286, n.63 (11th
Cir.2006)(overturned on other grounds), and used Dost in
crafting the pattern jury instruction for lascivious
exhibition used by the court here. In instructing the jury
(Doc 469 pg 33), the court included the six Dost factors: 1)
whether the focal point of the depiction is on the child's
genitalia or pubic area; 2) whether the setting of the visual
depiction is sexually suggestive, i.e., in a place or pose
generally associated with sexual activity; 3) whether the
child is depicted in an unnatural pose or is wearing
inappropriate attire, considering the age of the child; 4)
whether the visual depiction suggests sexual coyness or a
willingness to engage in sexual activity, and; 6) whether the
visual depiction is intended or designed to elicit a sexual
response in the viewer. The court added that the jury may

consider the "overall content of the material", and concluded that "a visual depiction need not involve all of these factors". Further guidance comes from other Circuits that have addressed the issue. "All six factors for the trier of fact to consider as a means of determining whether a genital exhibition is "lascivious" should be presented to the jury for consideration. Although more than one factor must be present in order to establish "lasciviousness" all six factors need not be present." United States v. Villard, 885 F.2d 117, 122 (3rd Cir.1989). "In determining whether an image is "lascivious", the US Court of Appeals for the Sixth Circuit applies a "limited context" test that permits consideration of the context in which the images were taken, but limits the consideration of contextual evidence to the circumstances directly related to the taking of the images. A number of factors can illuminate the context in which photographs were taken. These include, inter alia, evidence about (1) where, when and under what circumstances the photographs were taken; (2) the presence of other images of the same victim(s) taken at or around the same time; and (3) any statements a defendant made about the images... However, the Sixth Circuit explicitly rejects consideration of factors that do not relate directly to the taking of the images, such as past bad acts of the defendant, the defendant's possession of other pornography (of another type or other victims), and other generalized facts that would relate only to the general unseemliness of the defendant." United States v. Brown, 579 F.3d 672, 684 (6th

21

Cir.2009). "In the context of child pornography, the relevant factual inquiry is not whether the pictures in issue appealed, or were intended to appeal, to the defendant's sexual interest but whether, on their face, they appear to be of a sexual character. If they are not of a sexual character, then they are not illegal under the statute because they are not lascivious. In other words, it is the duty of the trier of fact in this kind of case to examine the pictures to determine whether they are designed to appeal to the sexual appetite, a[s], for instance, by exhibiting a sexual coyness or focusing on the pubic area of the subject in a way that is lewd or lurid." United States v. Wallenfang, 568 F.3d 649, 657 (8th Cir.2009). "The term lascivious exhibition means a depiction which displays or brings to view to attract notice to the genitals or pubic area of minors in order to incite lustfulness or sexual stimulation in the viewer. United States v. Rivera, 546 F.3d 245, 249 (2d Cir.2008).

The first factor asks if the focal point of the depiction is the genitalia or pubic area (because the girls are wearing underwear and the genitals are thus not exposed, this discussion will refer only to the "pubic area"). Such a decision tends to be easier to make when viewing a photograph rather than a video, as we must here. While there is no brightline test, common sense can tell a reasonable juror if the pubic area is the central focal point of the video. The simple fact that on occasion the pubic area may become visible within the video frame is not enough. As the girls (and the

camera) move around, there may be times where the pubic area of one girl or the other appears in the center of the frame. But such events are fleeting, not deliberate attempts to locate the pubic area, focus on it, and remain there for a period of time. For the overwhelming majority of this 21-minute video both girls are entirely visible in the video frame, generally in profile, and any viewing of the pubic area is incidental. As the First Circuit stated in reviewing application of this factor, "... the [girls'] legs are not widespread and the lighting of the [video] is not primarily directed at the genital region." United States v. Amirault, 123 F.3d 28, 33 (1st Cir.1999). See also United States v. Johnson, 2011 U.S. Dist. LEXIS 63515 (M.D. Fla, June 15)(holding that "there was no close-up, zoom, or highlight of the minor's pubic area in either video recording" in discussing the first Dost factor). No reasonable juror, seeing the video and taking into consideration the overall content and context of the video, would find the first Dost factor to be present.

The second factor asks if the setting of the video is sexually suggestive. Again, there is no brightline test. But courts reviewing this factor, including the Eleventh Circuit, have typically interpreted it to ask if the child is in a bedroom, on a bed, or otherwise placed in a location typically associated with sexual activity. For example the Fifth Circuit held that "Traditional settings that meet this standard are beds or bedrooms." United States v. Steen, 634 F.3d 822, 827

(5th Cir.2011). It is readily apparent from the video that the location is a photography studio, and no attempt has been made to simulate an area where sexual activity would be expected to occur. This mitigates against a finding of lasciviousness. The third factor similarly asks if the girls are posed unnaturally or wearing sexually suggestive or otherwise inappropriate clothing. The government no doubt will point to the "g-strings" being worn by the girls as being sexually suggestive and inappropriate. What the government chooses to ignore is that while such clothing may be frowned upon in the rather straitlaced morally repressive Northern District of Florida, "thong" underwear is worn by girls and women of all ages throughout the rest of the United States and the world at large. "G-strings", on the other hand, are something worn by strippers and dancers in "gentlemen's clubs". They tend to be quite flashy, bright-colored, and covered in sequins or feathers. The First Circuit has described inappropriate attire as "garters, lingerie, or high heels." Amirault, 173 F.3d, at 33, while the Third Circuit said "... a photograph of a girl in a highly sexual pose dressed in hose, garters and a bra would certainly be found to be lascivious." Villard, 885 F.2d, at 124. In this video, the girls appear to freely interact without direction from another, and they do not place themselves in positions that would be considered sexually suggestive. The absence of sexually suggestive posing and/or clothing again mitigates against a finding of lasciviousness and no reasonable juror would find either the second or third

24

factors present. The fourth factor asks if the child is fully or partially clothed, or nude. This factor is closely related to the second, regarding inappropriate attire, as well as the third factor regarding poses. As the court stated in Johnson, "mere nudity does not constitute the lascivious exhibition of the genitals or pubic area". The factor must be assessed within the overall content and context of the video and weighed against the other factors. Since the girls are wearing underwear, nudity is not a factor (bare chests are not a factor in lascivious exhibition). The fact that they are wearing underwear likewise is not sufficient to find lasciviousness. The fourth factor thus is not present. The fifth factor asks if the video suggests sexual coyness or a willingness to engage in sexual activity. As the First Circuit said, "[sexual] "coyness" is a relatively vague and subjective term (any expression or posture that does not show an overt willingness to engage in sexual activity could be construed as coy)." Amirault, 173 F.3d, at 33. Here the girls have little interaction with the camera at all, let alone portraying coyness in the process. And their expressions and postures are not demonstrating a "willingness to engage in sexual activity". There is no overall perception of sexuality, and no reasonable juror would find the fifth factor present. The sixth and final factor asks whether or not the visual depiction is intended or designed to elicit a sexual response in the viewer. The sixth factor "is the most difficult to apply." Steen, 634 F.3d, at 827-828. See also Amirault, 173

F.3d, at 34 ("This is the most confusing and contentious of
the Dost factors."). The Eleventh Circuit has not determined
whether the sixth factor should be analyzed using an objective
or subjective standard. In Amirault the First Circuit provided
what is probably the most reasoned analysis. The court stated
"We believe, however, that it is a mistake to look at the
actual effect of the [video] on the viewer, rather than on the
intended effect. See Villard, 885 F.2d at 125. If Amirault's
subjective reactions were relevant, a sexual deviant's quirks
could turn a Sears catalog into pornography. See id.; Wiegand,
812 F.2d at 1245 ("Private fantasies are not within the
statute's ambit.")." Amirault, 173 F.3d, at 34. The government
argued that the court should look "not only to the
composition, but also to the context surrounding the creation
and acquisition of the photograph", stating "there is no other
purpose for offering the photograph on the Internet than to
appeal to the sexually deviant interests of adults like
Amirault". The court disagreed, holding "We have serious
doubts that focusing upon the intent of the deviant
photographer is any more objective than focusing upon a
pedophile-viewer's reaction." The court also stated that "The
mere fact that the photograph was downloaded off the Internet
is insufficient to show that the photograph is intended to
elicit a sexual response. Cf. Villard, 885 F.2d at 125 ("When
a picture does not constitute child pornography, even though
it portrays nudity, it does not become child pornography
because it is placed ... in a forum where pedophiles might

26

enjoy it.")". The dissent in Steen noted "If we were to
conclude that the photographs were lascivious merely because
[the defendant] found them sexually arousing, we would be
engaging in conclusory bootstrapping rather than the task at
hand - a legal analysis of the sufficiency of the evidence of
lasciviousness." Steen, 634 F.3d, at dissent n.3. Arguments
by the government that the video here meets this factor either
because in its opinion Freeman found it sexually stimulating
or that it was allegedly shared in what they describe as a
child pornography trading group must of necessity fail. When
combined with the lack of any evidence or reasonable inference
as to why the producer of the video actually made it, no
reasonable juror could find this last factor present. In the
end, we are faced with a video that is nothing more than what
the government originally described. Two girls in underwear
playfully interacting in a manner that, while perhaps
distasteful to some people, fails to meet the definition of
lascivious exhibition. As the Ninth Circuit described in
United States v. Arvin, 900 F.2d 1385, 1391 (9th Cir.1988),
"something more than distasteful and more than bad taste must
be present for a conviction". Since the video is not child
pornography, further discussion of the required elements
wouldn't ordinarily be required. But in the interest of being
thorough for the court, the remaining elements of
transportation will be briefly touched on. Thus the second
question to answer is "Was the video moved in interstate or
foreign commerce by Freeman using a computer"? The

government's sole evidentiary offerings are 1) a text message purportedly posted by Freeman explaining where the video could be found (the video is not named or described in detail), and 2) testimony by Special Agent Wilder that the "h-o-ok.avi" video is in fact the video in the text message because Constable Power told him at a later date that it was (see Ground 17, addressing hearsay testimony). The FBI chose not to issue any subpoenas to determine if the text posting or the binary did in fact come from Freeman's Usenet account or computer. The government's oft-repeated notion that knowledge of the location is automatic proof of upload has no basis in reality. Such a contentious is analogous to a claim that Freeman's knowledge that a particular automobile is for sale at a particular price at a particular address automatically means Freeman owns the car simply because an FBI agent ultimately bought the car! What is most disturbing, and discussed in greater length elsewhere, is that in spite of the FBI issuing over 400 subpoenas in this case, they specifically chose NOT to issue any regarding the posting of this video. Lacking evidence to prove that the video was in fact transported by Freeman, there need not be any discussion on whether or not he knew it would move in interstate or foreign commerce. The final question, which the court explicitly left as a singular element, is whether or not Freeman believed the video was child pornography (assuming that he did in fact transport it) at the time it was transported. The text message introduced at trial simply stated "the best Show Stars video

that doesn't have Arina in it". No reasonable juror could
infer from this innocuous statement that the message poster
believed the video was pornographic. Freeman contended before
trial that the video was legal, a fact acknowledged by the
government during a pretrial hearing (Doc 763 pg 13). Freeman
sought a jury trial in large part because he believed the
video was legal, and here continues to maintain that same
belief. There is no evidence or reasonable inference from
which the jury could have found this element beyond a
reasonable doubt. A final issue to resolve regarding
transportation is the jury's ability to undertake the Dost
analysis just undertaken here. For reasons not adequately
explained by the government, defense counsel or the court, the
video in question was shown to the jury at an extremely high
speed. The record indicates that neither Freeman's defense
counsel nor the court had ever actually watched the video in
question at normal speed in its entirety. Only the government
and Freeman himself knew exactly what the video contained, or
more importantly, what it did not contain. So it is readily
apparent the government did not want the jury to know the true
nature of the video and its content. Doc 198-1 indicates the
video was 21 minutes and 6 seconds long, while the transcripts
indicate the government showed the video from 11:24:08 to
11:25:16, or 68 seconds. During this time the video was
scrolled through rapidly (Doc 721 ppg 280-281). The average
person has difficulty perceiving what is happening in a video
played at 4 times normal speed, and this video was played at

nearly 18 times normal speed. No reasonable juror could have possibly grasped the nature and content of the video under these circumstances.

The Grand Jury based its CEE indictment n part on two more videos produced by the Show Stars studio. While not actually referenced in support of any substantive counts, because they suffer many of the deficiencies just described and the government may point to them as the basis for the convictions under Counts 6 and 18 as well as the CEE, they are discussed here rather than in the later discussion on sufficiency of the evidence as to the CEE offense. A March 27, 2007 text posting provides the location information for two videos, stating "15 minutes of everybody's favorite naughty girl Arina, 30 minutes of Oxi and Mari." (Doc 198-1 pg 6, Doc 721 pg 275). Because the first video, titled "Arina-yellow.avi", was never played or described for the trial jury so it could make a determination regarding its legality, no further discussion need be had. It is not possible to reach reasonable doubt without seeing the video. The remaining video, however, was shown. Doc 198-1 describes the video, titled b_oximari.avi" thus: "A video (with audio) (approximately 30 minutes 42 seconds) depicting two prepubescent females. The video begins with the girls wearing what appears to be nightgowns. The girls then remove most of their clothing, excluding their underwear (both girls are wearing g-strings). The girls then take turns massaging each other. One of the girls kisses the back and buttocks of the

30

other girl. The girls then rub lotion over each other's body.
One of the girls then peels a banana and holds it while the
other girl licks it and inserts it in and out of her mouth
without biting it (simulating oral sex). The girls then switch
positions and the other girl begins inserting the banana in
and out of her mouth without biting it (simulating oral sex).
The girls then lick their fingers and rub them down their nude
upper bodies". The video, produced by the same photographer an
d studio as the "h-o-ok.avi" video, suffers the same Dost
deficiencies. The focus is never on the pubic area other than
in fleeting passes not designed to call attention to the area.
The setting is the same studio, with no bed or indication that
it is supposed to be a bedroom. The clothing is not
inappropriate, designed to elicit a sexual response, or worn
while otherwise posing in sexually suggestive ways. The
positions taken by the girls do not appear to be designed to
be sexually suggestive. The clothing, or lack thereof, is of
little consequence since there is no sexually suggestive
posing. In this case, the government's reference to "nude
upper bodies" is irrelevant, as the "genitals and pubic area"
do not include the upper body or chest. From the context of
Dost, the girls might as well have been rubbing their elbows.
The sexual significance would be the same. The girls do not
exhibit a willingness to engage in sexual activity, nor do
they exhibit sexual coyness. And finally, the government's
opinion as to why the video was made is of no evidentiary
value. Absent the direct testimony of the photographer, any

31

finding that he intended it to be sexually arousing would be speculation and hearsay. There remains one issue to resolve, unique to this video. The government made much of the girls' interaction with bananas, describing the activity as "simulated oral sex". Such a finding would of course negate the Dost analysis, making the video pornographic due to simulated sexual activity. The Eleventh Circuit, however, has already passed judgement on the matter of bananas and simulated sexual activity in another case. In Tilton v. Deslin Hotels, Inc. 2007 U.S. Dist. LEXIS 64168 (M.D. Fla) the distri ct court ruled "Upon review the images and video clips... the Court has not been able to identify an instance in which [Tilton's] actions created the realistic impression of a[n] actual sex act... While Plaintiff and her male counterpart are shown in various positions imitating and highly suggestive of sexual activity, no reasonable jury could conclude that [Tilton] and her male counterpart engaged in actual sex acts." At note #10, the court noted that "[Tilton] is also depicted eating and/or sucking a banana placed in her male counterpart's pubic area". Tilton was a 17 year-old girl who entered several contests being held during Spring Break in Daytona Beach. In affirming the judgement of the district court in Tilton v. Playboy Entm't Group, Inc. 554 F.3d 1371, 1378 (11th Cir.2009), the Eleventh Circuit stated "The district court ruled that Tilton's participation in the contests did not involve simulated sexual intercourse, under section 2256(2)(A)(i), because Tilton's conduct did not

32

"create the realistic impression of an actual sex act", and
that the evidence did not depict lascivious exhibition of
Tilton's genitals, under section 2256(2)(A)(v)". Given that
Tilton's male partner actually placed the banana in his crotch
to simulate an erect penis, Tilton then proceeded to place her
mouth on it and suck and bite on it, and the Eleventh Circuit
and district court both did not find this to reach the level
required to constitute simulated sexual activity, it would be
extremely difficult to rationalize that the activities of the
girls in the "b_oximari.avi" video does meet the definition.
As regards the remaining elements of both advertisement and
transportation, the postings also fail, and for the same
reasons previously given. No subpoenas were issued to track
either the text message or the binary upload to determine
where they came from. The government asked the jury to rely on
hearsay and speculation, and there are no reasonable
inferences to otherwise base a finding of guilt on. In closing
out the discussion, we turn again to the matter of high-speed
viewing. Again the government sought to show the jury a video
at high speed that defense counsel and the court had had never
actually watched themselves. The video was 30 minutes and 42
seconds long, and the transcript indicates it was shown from
11:16:26 to 11:18:42, or 136 seconds. Throughout the showing
the prosecutor discussed the fact that it was being scrolled
through rapidly (Doc 721 ppg 277-278). It is again readily
apparent that no reasonable juror could have undertaken any
reasonable analysis of the video and its

33

content to determine if it was pornography. Thus the March 27, 2007 video cannot be said to have been the basis of a finding of guilt beyond a reasonable doubt for the advertisement or transportation counts, nor as a predicate act for the CEE count.

Count 29 charged Freeman with receiving or attempting to receive child pornography. Reception, like transportation, contains four elements: 1) that the items were in fact received in interstate or foreign commerce; 2) that the defendant knew he was receiving them in interstate or foreign commerce; 3) that the items received were in fact child pornography, and 4) that at the time he received them, the defendant knew that he was receiving child pornography. The court, in charging the jury, combined these into three elements. First, that [Freeman] knowingly received the items charged. Second, that the items had actually been transported [to Freeman] in interstate or foreign commerce. And third, that at the time he received the items [Freeman] believed he was receiving child pornography. Doc 198-1 describes the relevant posting, by "Umami", from October 15, 2006 with the subject "future menue". The text states "BTW in pgp airplane 9+10 are posted. Valya 23 and 24. Valya 23, this is like I rather would keep her in mind than 13yo. Thanks to the spender (AC). Uma, faster than the postinfo." The posting contains no further details regarding where the videos are uploaded, by whom, or how to extract them, as the government has repeatedly contended is absolutely necessary to obtain content in the

34

alleged conspiracy. Because Freeman stipulated at trial (and does so again here) that the videos are pornographic based on having viewed them on brief pretrial, no discussion need be had regarding Dost. It is worth noting here briefly that while the posting mentions two videos, Doc 198-1 names and describes three videos, and the government played only one of them in part at high speed. Even so, the evidence is grossly insufficient regarding the remaining elements. The government asked the jury to find guilt on the basis of a text message allegedly posted by Freeman in which he states his opinion regarding "Valya" as a 12 year-old and a 13 year-old. The text makes no mention of having actually received the videos, nor does it describe or discuss the content of the videos, such that a reasonable inference could be drawn that he had actually received them. The government presented no evidence to indicate that all images or videos of "Valya" are pornographic, nor that Freeman (or anybody else) would have reason to believe the videos in question were going to be pornographic. In fact, the only evidence put before the jury is testimony by Special Agent Wilder that Constable Power, acting undercover, received the videos himself in Baltimore. And that testimony constitutes hearsay. To analogize, its as if a statement by Freeman that he prefers 1967 Mustangs over 1968 models, coupled with an FBI agent's testimony that a coworker owns both models, is definitive proof that Freeman himself also owns both models. No reasonable juror would find beyond a reasonable doubt that Freeman actually received or

attempted to receive the videos, nor that beforehand he had an expectation that the videos were pornographic. The government also presented evidence regarding two other videos mentioned in another posting (the "Laura" videos), but as these videos are not mentioned at all in Doc 198-1, they cannot be said to have been the basis of any conviction. But for the sake of argument, the evidence fails for the same reasons just stated. No evidence beyond the fact that Constable Power was able to receive the videos in Baltimore was presented. And in this case, the text message alleged to have been by Freeman doesn't even discuss the videos or the child in them. No reasonable juror could have based a conviction on these videos, either.

Count 2 charged Freeman and others with engaging in a criminal conspiracy to violate the laws of the United States under 18 U.S.C. §371. The elements of a criminal conspiracy are (1) an agreement between two or more persons to commit a crime, (2) an overt act in furtherance of the agreement was performed by one of the conspirators, and (3) knowledge of, intent to join, and participation in the conspiracy by each alleged conspirator. United States v. Ndiaye, 434 F.3d 1270, 1294 (11th Cir.2006). Before determining if Freeman was in fact a knowing participant in the conspiracy charged, it is necessary to determine if there was actually a §371 conspiracy for him to join. There is little caselaw governing child pornography conspiracies. But due in part to some contentions by the government, it would seem that a comparison can be drawn to drug distribution conspiracies. The government, in

36

defending a sentencing enhancement, claimed the alleged

conspirators were "exchanging" child pornography with each

other in a form of 'image for image' transaction as opposed to

simply sharing what they had without expectation of anything

in return. All of the government's evidence simply shows the

alleged conspirators uploading and downloading materials to

and from each other. This activity, if the government's

contentions are true, is analogous to the simple buyer-seller

transactions in drug cases. However, a "buyer-seller

relationship, without more, will not prove a conspiracy."

United States v. Maseratti, 1 F.3d 330, 336 (5th Cir.1993);

accord United States v. Colon, 549 F.3d 565, 569 (7th

Cir.2008) (What is necessary and sufficient is proof of an

agreement to commit a crime other than the crime that consists

of the sale itself"). See also United States v. Solomon, 686

F.2d 863, 876 (11th Cir.1982). It is the lack of an agreement

to commit that 'other' crime which brings doubt into the

conspiracy conviction. The Eleventh Circuit held in United

States v. Mora, 377 Fed. Appx. 842, 848 (11th Cir.2010) that

"There is a critical distinction between a conspiratorial

agreement and a buyer-seller transaction... the parties come

to an agreement, but the agreement amounts to the mere

exchange of drugs for money. This type of transaction is

simply not probative of an agreement to join together to

accomplish a criminal objective beyond that already being

accomplished by the transactions". The Seventh Circuit adds

"Regular purchases on standard terms cannot transform a

37

customer into a coconspirator." United States v. Kincannon, 567 F.3d 893, 897 (7th Cir.1998). In support of its case, the government entered into evidence a document called a "FAQ" (Frequently Asked Questions), said to be the hard and fast rules under which the alleged conspiracy operated (Trial Exhibit 10). The FAQ provides that "members" can share images of children, but are not required to do so. "Members" can also download images shared by others, but are not required to do so. "Members" can use PGP (Pretty Good Privacy) encryption and the key provided for that purpose for their material uploads, but are not required to do so. The images shared are not required to be illegal or even thought to be illegal, only that they be of children. "Members" then were not actually required to do anything at all. Constable Power testified that in the entire time he operated undercover in the alleged conspiracy, he never once advertised or uploaded any images. Cooperating codefendant John Mosman testified that he also never uploaded any images, and Defendant White wasn't even charged with uploading any child pornography. The government's own evidence, in the form of over 400,000 images and 1,000 videos downloaded by Constable Power, consists mostly of legal child modeling images. This was confirmed by the testimony of cooperating codefendant Warren Weber, who asserted that "over half" of the images shared were child modeling images. A final indication of the scope of the "group" and what it meant to be part of it is the lack of further postings beyond those Power noted in his Online Activity Reports. The government has

38

variously claimed between 45 and 62 alleged conspirators, and yet Constable Power downloaded messages and material uploads by only 27. Quantity seems not to have been a factor in this decision, since many of those persons had only a few postings. Twelve had 3 postings or less, in an 18-month period! According to the government's documents, 29 alleged conspirators exist only in name, as they never posted a message or uploaded any content. Apparently then, being a "member" of this alleged conspiracy imparted no obligations on any person to do anything except create a new nickname if the text group moved. Even if one never participated in the discussions held there. The four contentions of the government to prove the existence of a conspiracy are 1) that every conspirator was a previously-known open poster of child pornography; 2) that every conspirator took an "entry test"; 3) that every conspirator received the FAQ and thus possession of it proves membership, and 4) that only conspirators properly inducted into the conspiracy could possess the encryption keys. The first two contentions were disproved by the government's own witnesses when they testified variously that they had never taken the test or distributed child pornography. The second two contentions were testified to by witnesses, but that testimony is actually incredible as a matter of law (See Ground Twenty-One). There is no evidence in the record to indicate anyone entered into an agreement to produce the child pornography shared, or that it was being shared as part of an agreement for

39

further distribution outside the conspiracy. What the evidence does show is a group of individuals of varying tastes sharing images they possess with each other using a common readily available communications system in a private manner. The fact that some of these individuals may have engaged in criminal behavior does not create a criminal conspiracy, any more than a group of weightlifters at a gym trading illegal steroids automatically makes a conspiracy out of all of the gym's members. A defendant's association with conspirators and his knowledge of the conspirators' actions are not themselves sufficient proof of participation in a conspiracy. See United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir.1997) (stating that repeated presence at scene of drug trafficking, though probative, is not by itself sufficient evidence to support a conspiracy conviction); United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir.1995) (holding that "mere presence, guilty knowledge, even sympathetic observation have all been held by this court to fall short of the proof required to support" a conviction for "conspiracy to possess and distribute drugs"). There is simply no evidence supporting a finding of the existence of a conspiracy, let alone a finding that Freeman was a willing participant in it.

Count One charged Freeman with the offense of child exploitation enterprise in violation of 18 U.S.C. §2252A(g). It is important for this discussion to note again that the offense is NOT an overarching far-flung criminal organization, as one would typically characterize a "criminal enterprise".

40

While Congress may have engaged in a poor choice of words for
a title, it was clear with its intent when it used the
language "engages in the offense of" rather than terminology
such as "participates in", "is a member of" or "establishes"
an enterprise. Violation of §2252A(g) requires that only one
defendant be present and charged. The statute provides that
Freeman must have engaged in at least 3 predicate acts
(expressly limited by the Grand Jury to substantive offenses
of advertisement and/or transportation of child pornography).
The predicate acts must involve two or more victims combined.
And the predicate acts must be committed in concert with 3 or
more persons. This final element warrants further discussion
regarding the definition of "in concert" and the distribution
of the "3 or more persons". The government and the Eleventh
Circuit in part appear to believe that since the in concert
element meets the requirements of a conspiracy, requiring that
Count Two be vacated on double jeopardy grounds, the reverse
must be true. Such is not the case. Two or more persons who
have come together and actually committed an act "in concert"
with each other must of necessity had some prior agreement to
do so. But two or more persons can agree to commit an act
without ever committing it, which is a conspiracy. So it is
not true that they are the same in both directions. The CEE
statute requires more than an agreement to commit the act. It
requires that the act occur, and that the "in concert" persons
participate. To prove the element, the government needed to
show an actual and specific collaboration between Freeman and

41

3 or more other persons regarding each of the predicate acts
alleged. The requirement of 3 or more persons has only one
reasonable meaning regarding their distribution amongst the
predicate acts. That is that EACH predicate act requires the
collaboration of at least 3 more persons. That's not to say
that the SAME 3 or more persons can't collaborate on more than
one predicate act. To require only that there be a total of 3
or more persons would allow a CEE conviction where one
predicate act was committed in concert with 3 or more persons,
and the remaining acts to be solo offenses committed by the de
fendant at a place and time totally unknown to the other
persons. Such constitutes an absurd interpretation of what
Congress must have intended. The previous discussion is given
purely to point out that if the government had proved the
required 3 or more predicate acts, it would not have been able
to prove the remaining elements. It has already been shown
that the evidence was wholly insufficient to prove any
advertisement or transportation of child pornography, nor any
overall conspiracy to do so. The government likewise failed to
present any evidence that Freeman had collaborated with 3 or m
ore other persons in any of the specific acts charged. The
fact that others may have been able to read messages allegedly
posted by Freeman or download materials allegedly uploaded by
him would not be enough to infer a prior agreement and
assistance in bringing about the "transactions". Had it been
properly instructed on the law, no reasonable jury would have
convicted Freeman of Count One.

42

It would appear from the preceding discussions that the government completely failed to present sufficient evidence to prove any criminal activity by Freeman. The entire case is built on circumstantial evidence, inference, and large doses of deliberate prejudice."When the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction". United States v. Friske, 640 F.3d 1288, 1291 (11th Cir.2011). "It is a bedrock promise of our criminal justice system that the evidence supporting a conviction must raise more than the mere suspicion of guilt, and the jury's inferences must be more than speculation and conjecture in order to be reasonable." United States v. Lovern, 590 F.3d 1095, 1109 (10th Cir.2009). There are no reasonable constructions of the government's limited evidence to prove beyond a reasonable doubt any of the convictions returned. Thus there must have been some other factor or factors present causing the jury to return its guilty verdicts.

IMPROPER TESTIMONY

Much of the government's case centered on the testimony of two members of law enforcement, Constable Brendan Power and FBI Special Agent Charles Wilder. Power testified regarding his activities as an undercover member of the alleged conspiracy. Wilder testified regarding his investigation of Freeman and testified during the admitting of evidence. Much of the testimony by both of these men is incredible as a matter of law, draws improper legal

43

conclusions, constitutes hearsay, or is otherwise improper. Testimony is incredible "as a matter of law" when it offers "facts that the witness physically could not have possibly observed..." United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir.1985). See also United States v. Stanback, U.S. App. LEXIS 24234 (11th Cir.2011). "Lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury..." United States v. Noel, 581 F.3d 490, 498 (7th Cir.2009). Constable Power did not proffer expert or lay opinion testimony, but factual statements. Not once did he answer with phrases such as "I think...", "It's my opinion that..." or "It's likely that...", phrases that would have indicated an opinion. Some of Power's most glaring incredible testimony is that alleged conspirators never used the Internet outside Usenet (Doc 720 pg 57), that prospective members posted child pornography to become part of the conspiracy (Doc 720 pg 78)(later refuted by the testimony of Warren Weber and John Mosman, both while testifying for the government), that all members received a copy of the "Frequently Asked Questions" (FAQ)(Doc 720 pg 86), that alleged conspirators used nicknames and false account information strictly to hide from law enforcement (Doc 720 ppg 64, 119, 123), that a member would only comment on a particular upload after he had downloaded it (Doc 720 pg 136) and that the only people with PGP encryption keys specific to the alleged conspiracy were the members themselves (Doc 720 pg 140). Given that Power had no way to know: 1) what transpired before he began monitoring

the alleged conspiracy; 2) why any alleged conspirator did or did not perform some act or, 3) what any alleged conspirator did, without actually observing the action himself (ie downloaded something, shared PGP keys with an outsider, etc), these statements all constitute incredible testimony "as a matter of law". Power could not state them as actual fact to the jury. While the credibility of witnesses is the sole province of the jury (United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir.1999)), two other points made by Power should be noted here. At Doc 720 pg 76 Power testified that all persons seeking to become members of the alleged conspiracy would make their desires known in the newsgroup "alt.fan.yardbird" (more incredible testimony), and at Doc 720 pg 78 he testified that he himself took the "test" all members were alleged to have taken before being allowed in. And yet, at Doc 721 pg 175 he testified that nobody outside the alleged conspiracy knew it existed (begging the question of how prospective members could seek admission in "alt.fan.yardbird" to something they didn't know existed), and at Doc 721 pg 186 he testified that he had NOT taken the previously-discussed admission test. In closing, Power's statements as to why alleged conspirators sought anonymity constitute improper legal conclusions due to the defendants having been charged with obstruction of justice based on that same conduct.

Constable Power's testimony pales in comparison to that of Special Agent Wilder. Like Power, Wilder never used phrases that would indicate he was providing opinions. Each

answer was presented as a definitive fact. At least 20 times
Wilder testified that a particular text posting or material
upload was in fact done by Freeman (Doc 721 ppg 249-367). A
strict interpretation of the definition of "incredible
testimony" indicates that Wilder could not testify to these
"facts" unless he had personally been looking over Freeman's
shoulder at the time the posting was alleged to have occurred.
Even at that, Wilder was offering hearsay testimony. The prior
testimony was clear that Power did all of the downloading, mes
sage extraction and decryption. So Wilder had no firsthand
experience in actually downloading the messages and materials
himself. They were passed on to him some time after the
initial retrieval by Power. Thus Wilder could not actually
testify that the messages were in fact legitimate, let alone
testify that it was Freeman who posted them. Having spent most
of his time on the witness stand categorically stating that
Freeman had posted specific messages being entered into
evidence, Wilder proceeded on cross-examination to testify
that he could not possibly know Freeman posted any of the
messages, since they had not been subpoenaed (Doc 721 pg 295).
Wilder then reiterated this statement as it applied to each of
the specific pieces of evidence entered to that point (Doc 721
ppg 300-303). Like Power, Wilder's credibility is also in
question. At Doc 721 pg 306 he testified that the FBI never
subpoenaed a binary upload allegedly advertised by Freeman,
while at page 309 he testified that every time an item
attributed to Freeman was subpoenaed, the results pointed

directly back to Freeman. As shown later in the discussion on the government's Brady violations, both of these statements are patently false. In one subpoena the government sought information on 6 items alleged to have been posted by Freeman, and 5 of them returned information indicating they had been posted by 5 other persons not even accused of being part of the alleged conspiracy charged in this case (or any other criminal conspiracy). Unfortunately the jury was never given this information. Wilder also provided an improper legal conclusion at Doc 721 ppg 366, 367, when he stated that images possessed by Freeman were child pornography. Determination of the legal status of an image is the sole province of the trier of fact, and it is never helpful for a government witness to tell the jury what to decide. As shown, most of the testimony of Constable Power and Special Agent Wilder is incredible as a matter of law pursuant to Eleventh Circuit precedent, constituted impermissible hearsay, or developed legal conclusions. As to their remaining testimony, it would appear that absent some outside prejudice, no reasonable juror would have found the testimony of either witness credible.

## MISJOINDER AND PREJUDICE

Several grounds raised address prejudice suffered by Freeman due to the presence of six codefendants who were in large part standing trial for their own substantive offenses. Fed. Rule of Crim. P. 8(b) permits the joinder of defendants in the same indictment "if they are alleged to have participated in the same act or transaction". But here, each

47

defendant was charged with his own distinct substantive offenses. Neither the text of the indictment nor the evidence produced at trial pointed to any mutual interaction between defendants to bring about any specific act charged. For example, while Freeman was charged with receiving child pornography, it was never alleged or shown that one of the codefendants present had sent the material to him. Likewise, it was never alleged or shown that any of the codefendants read Freeman's alleged advertisements or received his alleged transportation. It is true that all defendants were charged with being a part of the same §371 conspiracy under Count 2, and the general rule is to try conspiracy defendants together. See United States v. Chavez, 584 F.3d 1354, 1359-60 (11th Cir.2009). But the mere presence of a conspiracy count does not rule out a requirement to sever defendants or counts. Venue also plays a large part in the matter. The presence of the conspiracy count does not overcome this problem. In an Eighth Circuit case, the court ruled that the defendant could not be tried in Missouri for a money laundering offense committed in Florida, despite the defendant also being charged as being a member of the drug conspiracy whose funds were bein g laundered. United States v. Cabrales, 109 F.3d 471 (8th Cir.1997). The court held that the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it. The Supreme Court affirmed the decision of the Eighth Circuit in United States v. Cabrales, 524 US 1 (1998). Clearly from this rationale,

venue was improper for all counts except the conspiracy and
Freeman's own substantive offenses, and the remaining counts
should have been severed (of course the codefendants have
their own prejudice argument regarding Freeman's substantive
offenses, since they were extradited to Florida to stand
trial). The question thus arises as to whether or not Freeman
was in fact prejudiced by the misjoinder. Freeman must show
the lack of a fair trial due to actual, compelling prejudice.
See United States v. Gari, 572 F.3d 1352 (11th Cir.2009).
There are four types of cases in which severance is should
occur, two of which appear here. The first is when inculpatory
evidence will be admitted against one defendant that is not
admissible against the other. United States v. Lane, 584 F.2d
60 (5th Cir.1978). In United States v. Baker, 98 F.3d 330 (8th
Cir.1996) (cited by the Eleventh Circuit in United States v.
Blankenship, 382 F.3d 1110, 1124 (11th Cir.2004)), the court
held that a defendant's joint trial posed a serious risk that
the jury would be prevented from making a reliable judgement
about his guilt or innocence due to evidence otherwise not
admissible against him were he being tried alone. As already
stated and as will be shown shortly, much evidence was
presented to the jury that it would have never seen had
Freeman been tried alone, and that evidence was quite
disturbing. Freeman was not implicated in any substantive act
of a codefendant and, contrary to the government's likely
argument, was not shown to have aided or abetted any of them.
The second relevant scenario requiring severance is where a

cumulative and prejudicial "spill over" effect may prevent the
jury from sifting through the evidence to make an
individualized determination as to each defendant. United
States v. Schlei, 122 F.3d 944 (11th Cir.1997). Prejudicial
spillover is evaluated through the process set out in United
States v. Prosperi, 201 F.3d 1335 (11th Cir.2000), which
provided four factors to be considered: "First, we consider
whether the jury meticulously sifted the evidence admitted for
all counts. Relevant to this inquiry is the similarity of the
evidence introduced for the separate counts: distinct evidence
is less likely to result in prejudicial spillover... Second,
we examine whether the contested evidence was inflammatory in
nature, and thus liable to prejudice the jury. Third, we
consider whether admission of the other evidence significantly
altered the defendant's trial strategy. Finally, we assess the
strength of the evidence against the defendant on the
remaining counts." (all internal citations omitted). The first
factor carries no hard and fast rule defining "meticulous",
but some common sense can be of assistance. The jury was asked
to review the evidence and weigh various multi-stacked
inferences and speculations in support of 39 substantive
offenses by 7 defendants. Were it to vote to convict on the
conspiracy count (which it did), an additional 35 decisions
were required to be made regarding objects of the conspiracy.
Records indicate that the jury deliberated for 3 hours and 51
minutes, during which time it also elected a foreman and took
a lunch break. Even assuming no time lost to these tasks,

50

only 3 minutes were allowed per decision to debate, reach a
unanimous decision, and mark the proper verdict form
accordingly. It can hardly be said the jury did anything in a
"meticulous" manner. Notable here is that, while told they had
the opportunity to do so, the jury did not ask to see any
image or video a second time. That in spite of the fact it had
been 8 days (including a 3-day holiday weekend) since they saw
the videos associated with Freeman's substantive counts at
high speed. All the jury could remember as it deliberated is
the last thing it saw. A four year-old being brutally sexually
assaulted, in a video attributed to one of the non-severed def
endants. Also relevant is the similarity of the evidence.
Since the defendants were all charged with the same statutory
offenses and were alleged to have committed them in the same
manner, the evidence was very similar. The second factor is
also present. This court need only read the descriptions in
Doc 198-1 of the various images and videos to be presented
against each codefendant and the relevant transcripts to grasp
the highly inflammatory and prejudicial nature of the
evidence. Even the court professed pretrial a concern that the
jury may become highly upset at the nature of the videos. The
inflammatory and prejudicial nature of the images and videos
was multiplied by the usage of a huge projection screen
creating larger-than-life images of children being raped.
Inflammatory evidence against two codefendants was also
introduced, in which one confessed in writing to molesting his
daughter and the other had obtained child pornography in

which the victim expressly told the codefendant's daughter it
would be "OK" if she did the same things with her father. None
of this evidence was admissible against Freeman in a solo
trial, nor was it admissible in proving the conspiracy.
Sufficiency of the evidence and the lack of overwhelming
evidence of guilt have both been discussed thoroughly. Thus
the fourth factor, asking if the government had a sufficient
case against Freeman in spite of the prejudicial evidence,
must be answered with a "no". The third factor is the most
difficult to ascertain at this time. Who can say if defense
counsel, who essentially abandoned Freeman on the field of
battle, so to speak, would have done differently had Freeman
been on trial alone? Only defense counsel can answer that
question. Freeman believes that defense counsel was
overwhelmed by the prejudicial nature and considered the trial
a lost cause no matter what he did. Hence the decision to not
mount a defense. It is clear from the preceding arguments that
the jury's verdicts are based on the prejudice caused by the
inflammatory evidence against others.

## ACCESS TO EVIDENCE

Numerous errors occurred in which the government
withheld evidence from Freeman that was exculpatory or failed
to properly preserve or destroyed original evidence. As
Constable Power testified, alleged conspirators encrypted
their messages with specific and unique encryption keys. Power
allegedly would download the encrypted message, decrypt it
with the appropriate key, and save the decrypted text. The

original encrypted message typically was then discarded. Feder
al Rule of Evidence 1002, the so-called "best-evidence rule",
provides that "An original writing, recording, or photograph
is required in order to prove its content unless these rules
or a federal statute provides otherwise". The Rule requires
production of the original only when the proponent of the
evidence seeks to prove the content of the writing. See United
States v. Howard, 953 F.2d 610, 612 & n.1 (11th Cir.1992). The
question to be addressed, then, is what constitutes the
"original writing? The government no doubt would like to say
the decrypted message is the "original", since it had to have
been written thus in order to encrypt it. But that is
fundamentally flawed. In the context of "evidence", what did
Constable Power obtain (ostensibly from Freeman) in his
activities? He obtained an encrypted message, from a Usenet
server. An encrypted message that was alleged to have been
encrypted to a specific key, that allegedly decrypted to
specific text. That is the thrust of the government's case,
what it sought to "prove". Compare to a letter written in a
foreign language, intercepted by the FBI and translated. If
the basis of the government's case was not only the fact that
the letter was written in a particular foreign language as
well as the content (translated so the jury could understand
it), it would be necessary to provide defense with the
original foreign-language letter in order to allow an
opportunity to conduct their own translation. The same holds
true here. Freeman was unable to verify or

otherwise challenge the authenticity of the text messages
entered into evidence. And since the decrypter (Constable
Power) was not testifying as to the authenticity of any
message, Freeman could not cross-examine him on the matter.
This problem might have been negated had Freeman had access to
the original server content as a result of the government issu
ing a Preservation Letter to the various Usenet service
providers involved. But it chose not to do so, fully aware
that within six months of the original posting any messages or
material uploads would "expire" and no longer be available. La
stly, the government withheld subpoenas and their returns that
were without a doubt exculpatory. The government's rationale
was that these subpoenas were inculpatory because "they show
Freeman's membership in another child exploitation group".
Unfortunately for the government "child exploitation" is a
broad term that is not an illegal act, especially since it is
performed by advertising agencies and corporate America on a
daily basis (which is why Congress refuses to create such a
law). What these subpoenas do show is that repeatedly the
government sought account and IP address information for
postings it attributed to Freeman, but the information that
came back showed someone else posted the message or material.
This of course directly contradicts the government's theory of
guilt, thus the evidence is exculpatory. The government's
actions here violate Brady v. Maryland, 378 US 83 (1963). The
Brady doctrine states that "the suppression by the prosecution
of evidence favorable to an accused upon request violates due

54

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 378 US, at 87-88. In Arizona v. Youngblood, 488 US 51 (1988) the court stated "In criminal cases courts have developed law regarding a defendant's constitutionally guaranteed access to evidence. That area of law includes claims under Brady v. Maryland that the prosecution suppressed exculpatory evidence, as well as claims that the government destroyed potentially exculpatory evidence. Youngblood, 488 US, at 55-57. Freeman made repeated attempts to gain access to the evidence to properly analyze it. Recognizing the difficulty and expense of detailed forensic analysis of the computer drives involved (most notably Power's main drives, Exhibits 1A and 1B), Freeman was willing to settle for nothing more than a directory listing of the files each drive contained. The government repeatedly rebuffed these efforts, while at the same time refusing to allow Freeman an "ample" opportunity to examine the drives personally, as required under 18 U.S.C. §3509(m). During trial, Special Agent Wilder testified that the file listings Freeman had been requesting were in fact available. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Grossman v. McDonough, 466 F.3d 1325, 1341-42 (11th Cir.2006). Thus "the materiality standard for Brady claims is met when the favorable evidence could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict."
Banks v. Dretke, 540 US 668 (2004). The government's denial of
the evidence not only prevented Freeman from establishing
reasonable doubt before the jury, it prevented Freeman from
being able to adequately assist his defense counsel, who
obviously was clueless regarding the nature of Usenet and
encryption.

                    INEFFECTIVE ASSISTANCE OF COUNSEL

          Criminal defendants are entitled to the "effective
assistance of counsel", that is, representation that does not
fall "below an objective standard of reasonableness" in light
of "prevailing professional norms." Strickland v. Washington,
466 U.S. 668, 686 (1984). By necessity, the standard is a
general one. "No particular set of detailed rules for
counsel's conduct can satisfactorily take account of the
variety of circumstances faced by defense counsel or the range
of legitimate decisions regarding how best to represent a
criminal defendant." 466 U.S., at 688-689. Restatements of
professional standards ... can be useful as "guides" to what
reasonableness entails... id., at 688. Ineffectiveness in this
case is divided into stages due to the various standards
applied according to the timeframe within which the
ineffectiveness occurred. Ground 72 addresses a substantive
claim of ineffectiveness pretrial. Rule 12 of the Federal
Rules of Criminal Procedure provides in subsection (b) that
five categories of defenses, objections or requests "must be
raised prior to trial". Failing to raise them "shall

                               56

constitute waiver thereof...". The five categories are: (1)
defenses and objections based on defects in the institution of
the prosecution (Ground Four); (2) defenses and objections
based on defects in the indictment (Grounds Eight, Fourteen
and Thirty-Five); (3) motions to suppress evidence (Grounds
Five, Six and Seven); (4) requests addressing discovery under
Rule 16 (Grounds One, Two, Three, Nine and Ten), and (5)
requests for severance of charges or defendants (Grounds
Fourteen, and  Twenty-Three through Twenty-Five). It is not
disputed that defense counsel provided SOME assistance
pretrial; having filed motions to dismiss two counts (Doc 313,
317), sought a bill of particulars (Doc 321), and sought to
compel discovery (Doc 361). But it is also readily apparent
that there were many pretrial issues counsel failed for
whatever reason to raise, issues that at a minimum would have
been preserved for appeal and most likely would have resulted
in favorable rulings for Freeman. In determining what a
"reasonable attorney" would have done, professional standards
tell us that "Since the five enumerated "defenses, objections
or requests" that must be raised pretrial either represent all
of the actions that a defense attorney would want to take in
order to ensure that a defendant is placed in the most
favorable position possible, or constitute almost everything
that a defense attorney would need to have access to in order
to intelligently represent a client, it is critical that
counsel make the appropriate pretrial motions and requests
for information."(1 Cipes, Bernstein & Hall, Criminal Defense

Techniques §1B.02). The relative merits of the various
pretrial grounds are discussed throughout the memorandum and
thus need no detailed discussion here. Strickland requires
that Freeman meet a two-pronged test: (1) that counsel's
performance was deficient; and (2) that the deficient
performance prejudiced Freeman. According to the previously-
cited professional standards, it is apparent that reasonable
defense attorneys are in the practice of thoroughly addressing
pretrial motions and taking full advantage of the benefits
they may impart. Thus counsel, who failed to challenge the
timeliness of the indictment, challenge the charging language
therein, move to suppress Freeman's coerced statements or
improperly obtained evidence, and failed utterly to address
the matter of prejudicial misjoinder requiring severance, was
clearly deficient. But for counsel's failure, these issues no
doubt would have resulted in favorable rulings had they been
raised either at trial or been preserved for appeal. "There
really is no good excuse for such a failure and diligent
counsel will never place a client in such a position" (1
Cipes, Bernstein & Hall, Criminal Defense Techniques §1B.08).

Counsel's actions during the trial itself can be
equated to a boxing match, in which the government went on the
offensive, throwing punch after punch, and defense counsel did
nothing but duck and dodge and weave. When the government stop
ped throwing punches, defense counsel simply laid down on the
floor to be counted out. Such a performance is judged by a
different standard. In United States v. Cronic, 466 US 648

(1984), the Supreme Court stated that Strickland did not apply
where the accused is denied counsel at a critical stage of
trial or "counsel entirely fails to subject the prosecution's
case to meaningful adversarial testing." Cronic, 466 US at
659. "When either occurs, the reviewing court presumes the
defendant was prejudice and his conviction is in turn
vacated." Darden v. United States, 2013 U.S. App. LEXIS 2928
(11th Cir.2013). It is readily apparent that trial counsel
failed to subject the government's case to any "meaningful"
adversarial testing. Yes, counsel objected repeatedly, and
conducted brief cross-examinations. This is the "dodging and
weaving" suggested above. When counsel chose not to present
any defense whatsoever, the jury was forced to accept any
inference, reasonable or not, from the government's evidence.
As the Second Circuit said, "When a defendant has offered no
case, it may be reasonable for a jury to draw inferences from
the prosecution's evidence which would be impermissible if the
defendant had supplied a credible exculpatory version." United
States v. Frank, 494 F.2d 145, 153 (2d Cir.1973). The jury was
forced to accept the credibility of the government's
witnesses, having seen or heard nothing to the contrary. And
of course Freeman's claim of innocence (the reason for a trial
at all) lost all credibility. "Any competent trial lawyer
understands that in order to mount a successful case before a
jury, credibility must never be sacrificed." Id. What trial
counsel did is concede Freeman's guilt, essentially abandoning
him. It can not be said that the defense stage of a trial is

not a "critical" stage. It is in fact the most critical of
stages. In Geders v. United States, 425 US 80 (1976), the
Supreme Court ruled that an overnight recess mid-trial (an
event that occurs in any trial lasting more than one day)
constituted a "critical stage". Surely then the period in
which the attorney is permitted to enter evidence and plead
his client's case is even more critical. After reviewing the
facts already presented addressing sufficiency of the evidence
on all counts, it is readily apparent that Freeman was
prejudiced by trial counsel not presenting this same evidence
to the jury, and the outcome certainly would have been
different (assuming an honest jury not prejudiced by other
evidence). Substantive claims of ineffective assistance have
also been made regarding trial counsel's performance at
sentencing and a claim for restitution. Briefly, and of the
most importance, is counsel's failure to argue that the
inclusion of Freeman's prior conviction as a sentencing factor
should have been decided by the jury, not the sentencing
judge. It is well-settled that the FACT of a conviction may be
decided by the sentencing judge, but it is not so clear that a
judge may decide the NATURE of a prior conviction. It is
understood that this court is bound by the Eleventh Circuit's
decision in United States v. Greer, 440 F.3d 1267 (11th
Cir.2006), in which the court found that "[Apprendi et al] do
not forbid a judge from determining the factual nature of a
prior conviction" but instead "restrict the sources or
evidence that the judge (instead of a jury)

may consider in making that finding." Greer, 440 F.3d at 1273-74. But no such sources were provided to the court, as they did not exist. The court did not make a "factual" finding at all. He merely acquiesced to the government's demand for the enhancement. Trial counsel should have argued the point, if for nothing more than appellate preservation.

Appellate counsel was equally ineffective, and the case is an easy one to make. "Where, as here, appellate counse l fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so." Eagle v. Linahan, 279 F.3d 926, 943 (11th Cir.2001). As previously shown, the indictment in this case was legally deficient for failing to state the offense conduct with particularity. But appellate counsel raised the issue as to only one count, in spite of repeated demands by Freeman to raise it regarding all counts except the conspiracy. Based on the Eleventh Circuit's ruling as to the obstruction count, raising the issue would most certainly have been successful. An additional issue is the matter of sufficiency of the evidence. As already detailed, evidence of guilt was grossly absent, and appellate counsel could have easily prevailed on the arguments had he presented them. These are but two of the many solid arguments counsel could have and should have raised. Although failing to include all nonfrivolous issues is not in itself ineffective assistance (see Jones v. Barnes, 463 US 745 (1983)),

61

counsel should strive to satisfy the client that all potentially successful claims have been raised. See Head v. United States, 489 A.2d 798, 801 (D.C. 1986). The Supreme Court wrote that "Most cases present only one, two or three significant questions... Usually,... if you cannot win on a few major points, the others are not likely to help..." Jones at 3313. Any reasonable (and experienced) appellate attorney would have raised those issues that stood the best chance of success AND would have the greatest impact on his client. At a minimum Freeman would have obtained a new trial on all counts due to the imperfect indictment, and he stood a better than average chance at reversal of all the convictions due to insufficient evidence. Appellate counsel also erred greatly when he chose not to argue the well-preserved issues of sufficiency of the evidence and the improper admission of evidence under the business records exception.

Appellate counsel was also ineffective when he allowed the Eleventh Circuit to uphold the conviction for the CEE on a basis it was not permitted to use. On petition for rehearing, he chose to argue a procedural standard of review error rather than pointing out that the court had ignored over 100 years of Supreme Court precedent in rewriting the indictment and retrying the case from the bench. Any reasonable lawyer would have identified and argued the major points raised (indeed Freeman, a layman, sought to do exactly that pro se but was rebuffed by the Eleventh Circuit), and been successful.

There are many, many more examples within this motion

of issues that should have been addressed by either trial or appellate counsel. Incredible testimony. Interference with witnesses. Countless episodes of prosecutorial misconduct. Procedural errors. Discretionary errors. The list is long. To sum, defendants are guaranteed the right to effective assistance of counsel at all critical stages (United States v. Wade, 388 U.S. 218 (1967)), on appeal (Halbert v. Michigan, 54 5 U.S. 605 (2005)) and at sentencing (Glover v. United States, 531 U.S. 198 (2001)). Freeman was not provided with the level of competent and effective counsel these cases and the Constitution envisioned. The fact that Freeman, a layman not trained in the law, was able to identify these issues, shows that any reasonable lawyer would have done so. Freeman's failure to specifically explain counsels' ineffectiveness for each issue does not mean he chooses to ignore or waive them. Such matters, if needed, can be discussed further at an evidentiary hearing.

## REQUEST FOR AN EVIDENTIARY HEARING

"Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief, "a defendant must support his allegations with at least a proffer of some credible supporting evidence." United States v. Hammond, 2009 U.S. Dist. LEXIS 126802 (N.D. Fla 2009). "To be entitled to an evidentiary hearing ..., petitioner must proffer evidence that, if true, would entitle him to relief." Hill v. Moore, 175 F.3d 915, 922 (11th

Cir.1999). While, as addressed above, Freeman did not discuss every ground in detail, he has clearly met the burden required for an evidentiary hearing. The supporting facts for each ground raised proffer sufficient evidence; in some of them, evidence sufficient for summary judgement in Freeman's favor simply from the existing record. Nonetheless, Freeman hereby formally requests that an evidentiary hearing be held at the earliest opportunity in this matter.

CONCLUSION

Freeman reiterates once again that he does not waive any ground raised in the motion simply because it is not discussed here. The simple truth is that the court could grant Freeman summary judgement and acquit him on all counts based merely on the motion and the major errors discussed in this memorandum. The remaining grounds would thus be rendered moot. Freeman respectfully requests nothing more than a fair and honest consideration of this §2255 motion, free from prejudice and bias. Freeman also asks that this court act with diligence, as "justice delayed is justice denied".

64