IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


UNITED STATES OF AMERICA       CASE NUMBERS
                                    NO. 3:08cr22/LAC

v.                               NO. 3:13cv304/LAC/EMT

JAMES FREEMAN
_____

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO CONDUCT DISCOVERY

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney, and in response to defendant JAMES FREEMAN's motion for discovery in his Title 28, United States Code, Section 2255 matter, shows unto the Court the following:

## I. STATEMENT OF THE CASE

The facts of this case are set forth in the superseding indictment, transcripts of the trial & sentencing, the pre-sentence investigation report (PSR), the judgment & statement of reasons, and the mandate of the Eleventh Circuit Court of Appeals.  (Docs. 78, 661, 662, 720-725, 766, 767, 835, 903; PSR).  Moreover, the facts are well articulated in the two published opinions born from the instant superseding indictment.  *United States v. McGarity*, 669 F.3d 1218 (11th Cir. 2012); *United States v. Wayerski*, 624 F.3d 1342 (11th Cir. 2010).  In sum, the defendant was a member of an international child exploitation

enterprise who shared child pornography over the internet.  The government's evidence of the defendant's guilt, which included seizures directly from the defendant, was "overwhelming."  *McGarity*, 669 F.3d at 1242-43, 1246, 1263.  An overview of the investigation into the criminal enterprise is outlined below.

In late 2005, an individual informed Constable Brenden Power of the Queensland Police Service in Brisbane, Australia, that said individual was a member of an illicit group of persons who traded child pornography in internet newsgroups.  (Doc. 720, pp. 51-55).  Similar to how web sites are on the world wide web portion of the internet, newsgroups are on the usenet portion of the internet.  (*Id*. at 57).  Similar to how one uses an internet service provider ("ISP") for world wide web access, one uses a news service provider ("NSP") for usenet access.  (*Id*. at 57-65).  The individual told Power what newsgroup the persons in the enterprise were currently using, and provided Power his newsgroup nickname/screen name and PGP (Pretty Good Privacy) encryption keys to enable Power to decrypt messages and materials that group members posted and uploaded.  (*Id*. at 53-55).  Power assumed the individual's internet newsgroup identity and began to monitor the illicit enterprise in an undercover capacity.  (*Id*.).  Power's investigation revealed that many NSPs and group members were in the United States. (*Id*.).  In August 2006, Power, now acting in conjunction with the Federal Bureau of Investigation (FBI), came to the United States and continued his investigation.  (*Id*.).

The group members used extensive, sophisticated security measures to maintain their hidden identities and to provide child pornography to one another without being

caught by law enforcement.  (*Id*. at 65-119).  The group communicated via encrypted text posts in an innocuous newsgroup, such as a newsgroup for things of Japanese interest, and the group frequently moved to new newsgroups to avoid law enforcement. (*Id*.).  The group used a set of other innocuous newsgroups to transport and receive binary (images/videos) files of child pornography.  (*Id*.).

To provide child pornography to other members, a group member would upload scrambled and encrypted binary files of child pornography to one of the newsgroups on which members posted binary files (and the files would have a subject line and uploader's nickname associated with them).  (*Id*. at 84, 110-119).  The providing group member would then post an encrypted text message in the newsgroup the group was using for text posts; telling the group of the upload, where it was, and how to unscramble it.  (*Id*. at 84, 102-103, 106-119).  The recipient group members would decrypt the text message sent to the text newsgroup, read the providing member's text about the upload, follow the instructions to find the uploaded child pornography files, decrypt the files, follow the instructions to unscramble the files, and then be in possession of viewable child pornography videos or images.  (*Id*.).  Senders would encrypt text and binary posts with unique PGP encryption keys, and receivers would decrypt the posts with those unique PGP encryption keys which were only possessed by group members (group members had an encryption key for text posts and an encryption key for binary posts).  (*Id*. at 72-74, 86-102).

The leader of the group was known as "Yardbird."  (*Id*. at 75; Doc. 721, pp.

201-202, 229).    Yardbird invited persons he ascertained to be posters of child pornography to join the group.  (*Id*.).   Yardbird required invitees to provide him with numerous child pornography files and required invitees to pass a timed test to ensure they were not law enforcement officers.   (Doc. 720, pp. 75-81).   The invitations and test took place on a newsgroup named "alt.fan.yardbird," and after an invitee passed the test, Yardbird disclosed the name of the current newsgroup the group was using for text postings.  (*Id*.).   New members were also provided with the PGP encryption keys the group was then using, two security documents known as the "FAQ" and the "Doctor Who" statement, and Yardbird also introduced the new members to the rest of the group (via a post).  (*Id*.).   Yardbird decided when the group would move to a new newsgroup. (*Id*. at 77, 81-86).   When the group moved to a new newsgroup location, members adopted new nicknames, Yardbird provided group members with a list of old nicknames and new nicknames so group members knew who was who, and Yardbird supplied group members with new encryption keys.  (*Id*. at 81-86, 122, 124-126).   Power tracked the nicknames used by specific members as the group moved from newsgroup to newsgroup. (*Id*.).

While he was an undercover member in the group, Power downloaded and saved posts and information traded within the group onto two external hard drives that were admitted in evidence at trial.  (*Id*. at 55-56; Doc. 721, pp. 193-194).   For investigative purposes, Power saved the encryption keys used in each newsgroup (once the group moved to a new newsgroup and received new encryption keys, group members had no

need to save the keys from old newsgroups – although, as discussed *infra*, many of the defendants saved a number of old keys).   (Doc. 720, pp. 94-97; Doc. 721, p. 196). When Power and the FBI began the joint investigation, the group had approximately 45 members.   (Doc. 720, pp. 123-124).   While Power was in the group, over 400,000 images and over 1,000 videos were traded.   (*Id*. at p. 129).

When Power came to the United States, a grand jury investigation regarding the enterprise was opened in the District of Maryland.   (*Id*. at 126).   After the group member known as "Vanquish" was positively identified (the defendant), who resided in the Northern District of Florida, a grand jury investigation was opened in Pensacola, Florida.   (*Id*. at 126-127; Doc. 721, pp. 247-270).   In addition to the group's security measures described above, Power and cooperating co-defendants Ruble Keys and Warren Weber testified at trial that the group wanted to avoid law enforcement and discussed security and current law enforcement activities in text posts.   (Doc. 720, pp. 74, 102-103; Doc. 721, pp. 202-203, 231-232).   Cooperating co-defendant Weber also testified he wrote a program that mimicked a crashed computer and turned off all Windows' response to the keyboard, which he posted to the group.   (Doc. 721, p. 202).   The group's FAQ document stated "the criteria used in this process should keep the group free of LEA moles. . . ."   (Doc. 720, p. 88).   Power testified that "LEA" stood for law enforcement agent or agency.   (*Id*.).   The FAQ document also stated that old encryption keys "might now be on an LEA keyring . . . the more we can hide ourselves, the better."   (*Id*. at 90). The group members posted messages warning that security lapses could lead to problems

with LEAs and suggested the group create a code to use if someone was compromised. (Doc. 722, pp. 617-622, 729-731).   The group had a code to post in case of a major security breach, which Yardbird issued after search warrants were simultaneously executed at the defendants' residences.   (Doc. 720, pp. 91-92, 126-129).

On February 29, 2008, law enforcement executed federal search warrants at the residences of the defendants.   (Doc. 721, pp. 311, 410; Doc. 722, pp. 508, 645; Doc. 723, pp. 781-782, 787-789, 886, 990).   A number of the encryption keys the group had used were found on every defendant's computer and/or other digital media, except for co-defendant Neville McGarity. (Doc. 721, pp. 361-362, 365-366, 451-452; Doc. 722, pp. 540-543, 676, 680-681; Doc. 723, pp. 827-829, 922-923).   The keys were unique to the group, and the keys on defendant Castleman's, Freeman's, Lakey's, Lambert's, Mumpower's and White's digital media matched the keys provided to Constable Power when he was an undercover group member.   (Doc. 721, pp. 365-366, 451-452; Doc. 722, pp. 540-543, 680-681; Doc. 723, pp. 827-829, 922-923).

Based upon this conduct, the defendant, along with thirteen others, was indicted in a multi-count superseding indictment involving a global enterprise at whose core was the online exploitation of children.   (Doc. 78).   The defendant exercised his right to a jury trial, and he was found guilty as charged.   The PSR reiterated and confirmed identifying facts as detailed above.   The defendant was sentenced to life imprisonment as to Count One, 600 months imprisonment as to Counts Two and Six, 480 months imprisonment as to Counts Eighteen and Twenty-Nine, and 240 months imprisonment as to Count Forty –

all to run concurrent.   (Doc. 661).   The defendant filed a notice of appeal.   (Doc. 698).
The Eleventh Circuit Court of Appeals affirmed the defendant's life sentence on Count
One, and said Court affirmed multiple other counts as well.[1]   The defendant's request for
review by the United States Supreme Court was denied.   On or about May 2, 2013, the
defendant filed a motion pursuant to Title 28, United States Code, Section 2255 along
with a sixty-nine page memorandum in support.   (Docs. 972, 973).   The government
was ordered to respond and did so.   (Doc. 1001).   On or about November 12, 2013, the
defendant filed a reply to the government's response.   (Doc. 1048).   Now,
approximately eight (8) months after filing his motion to vacate and two (2) months after
filing his reply to the government's response, the defendant files the instant untimely and
legally unfounded motion.   (Doc. 1067).

## II. LEGAL ANALYSIS

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled
to discovery as a matter of ordinary course."   *Bracy v. Gramley*, 520 U.S. 899, 904
(1997); *Isaacs v. Head*, 300 F.3d 1232, 1248 (11th Cir. 2002).   Pursuant to Rule 6 of the
Rules Governing §2255 Proceedings, a defendant must request leave of Court in order to
engage in post-conviction discovery.   To prevail, the defendant (a) "must provide
reasons" for the discovery request and (b) convince the Court that "good cause" for said
request exists.   *See* Rule 6(b) and (a) of the Rules Governing §2255 Proceedings.   As
the defendant has failed to articulate either of these requirements, the instant motion

---

[1] *McGarity*, 669 F.3d at 1270-1271.   The Court vacated Counts Two and Forty.

should be denied.

First, the defendant's motion fails to provide legally founded reasons behind a discovery request that actually <u>post-dates</u> both his motion to vacate and his reply to the government's response thereto.  (Doc. 1067).  The defendant merely lists a handful of items or pieces of information he desires and asserts they are necessary to prove "the fallacy" of the government's evidence and/or exculpate him.  (*Id*.).  These vague and baseless allegations do not meet the required showing in that the defendant "must" articulate cognizable reasons behind his request.  Rule 6(b) of the Rules Governing §2255 Proceedings.[2]  It should not be incumbent on the U.S. Attorney's Office to gather evidence for the defendant for speculative or unspecified purposes.  As such, the motion is infirm.  *See also Stephens v. United States*, 14 F.Supp.2d 1322, 1326 (N.D. Ga. April 22, 1998).[3]

Second, the defendant's motion fails to articulate "good cause" as to why he needs the items/information and how the items/information relate to his underlying motion. Indeed, the defendant must articulate specific allegations for relief in his §2255 motion that suggest he might be entitled to said relief and would now require the requested materials to help demonstrate his position.  *Bracy*, 520 U.S. at 908-909; *see also Honken v. United States*, 2011 WL 4527572 at *1 (N.D. Iowa Sept. 28, 2011).   The Court should

---

[2]  According to the Advisory Committee Notes, this requirement is apparently to advise the Court of the necessity for discovery and enable the Court to make certain an inquiry is relevant.  Furthermore, it would be inconsistent with Criminal Rule of Procedure 16 to order production of items or information without any preliminary showing of materiality.

[3]  There are a wealth of United States District Court Orders on this subject from around the country.  The

not allow a "fishing expedition" based upon nothing "other than the Dickensian hope that 'something will turn up.'" *Custis v. United States*, 923 F.Supp. 768, 769 (D. Md. May 2, 1996).   The defendant's underlying §2255 motion asserts seventy-eight grounds of infirmity that range from ineffective assistance of counsel to errors made by the Eleventh Circuit Court of Appeals.   All of these assertions regard trial/appellate practice and are clearly placed on the record, thus there is no "good cause" as to why the defendant needs items that do not seem to legally impact said assertions.   The defendant, in sum, is engaging in a "fishing expedition."   The basis of the defendant's instant request lies outside a discovery motion and may only be relevant if this Court believes an evidentiary hearing is required on the underlying motion to vacate.

Indeed, in the instant motion, the defendant is requesting two specific subpoenas issued by the Federal Bureau of Investigation, all subpoenas issued to news service providers in his case, electronic directory listings of some sort, and interrogatories for defense counsel.   All of these materials, if they were discoverable, were provided to the defense prior to trial and/or utilized at trial and are thus part of the record.   Thus, the defense already had access to them.   Moreover, when compared to the underlying motion to vacate , these items in no way demonstrate that the defendant is entitled to relief.[4]   To date, none of the defendant's filings articulate how the standards of ineffectiveness can be met or that there was a "fallacy" underlying his guilt, and indeed we already know the

government has cited a mere handful to provide a backdrop for this Court.
[4] Quite telling, it appears the defendant's motion to vacate with memorandum, which total one hundred pages, do not make specific mention of the subpoenas IINI 1304 or 2292 which the defendant now seeks.

government's evidence of the defendant's guilt, which included seizures directly from the defendant, was "overwhelming."   *McGarity*, 669 F.3d at 1242-43, 1246, 1263.

Finally, the government must point out the disingenuousness of the instant motion.   The reasons are twofold.   First, co-defendants have already attempted to obtain similar materials in very similar "fishing expeditions."   That is, co-defendant Daniel Castleman previously requested discovery materials but has been denied repeatedly, and the defendant knows this because the defendants are housed at the same federal institution.   (Docs. 1025, 1027, 1029, 1057, 1060, 1063).   Second, and potentially more instructive, the defendant is also housed at the same federal institution as co-defendant Neville McGarity.   This is relevant because co-defendant Neville McGarity also attempted to engage in the same meritless search as the defendant does herein.   Indeed, co-defendant McGarity filed a motion to procure documents from the instant litigation in order to pursue his §2255 motion.   (Doc. 955).   The United States District Court denied this motion because it would not have the government "fund fishing expeditions."   (Doc. 956).   Co-defendant McGarity appealed the decision of the United States District Court (Doc. 957), but said decision was affirmed.   (Docs. 970, 993).   This defendant now, after trying to learn from co-defendant Castleman's and McGarity's failed motions, merely recalibrates the vehicle with which he is attempting to circumvent applicable law.

The defendant has not met his statutory burden of proof.   THEREFORE, the defendant's motion, for the reasons stated above, should be denied.

Respectfully submitted,

PAMELA C. MARSH
United States Attorney

*/s/ David L. Goldberg*

David L. Goldberg
Assistant United States Attorney
Member of the Maryland Bar
21 E. Garden Street, Suite 400
Pensacola, Florida 32502-5675
850-444-4000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been electronically filed and sent via United States mail to James Freeman, Inmate #06947-017, USP Tucson, P.O. Box 24550, Tucson, Arizona, 85734, on this the 23rd day of January, 2014.

*/s/ David L. Goldberg*

David L. Goldberg
Assistant U.S. Attorney